IN THE DISTRICT COURT IN AND FOR OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

SEP 19 2017

RICK WARREN
COURT CLERK
40

| | | |
|---|---|---|
| **FRONTIER STATE BANK, an Oklahoma State Banking Corporation** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Case No.** CJ-2017-5314 |
| | § | |
| **WUNDERLICH LOAN CAPITAL CORP.** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL PETITION**

COMES NOW Plaintiff, Frontier State Bank, ("Frontier"), and files this Original Petition against Wunderlich Loan Capital Corp. ("Wunderlich").

## I. Parties

1. Frontier is an Oklahoma State Banking Corporation, duly organized and existing under the laws of the State of Oklahoma, with its principal office in Oklahoma City, Oklahoma.

2. Wunderlich is a Delaware Corporation, with its principal office in Memphis Tennessee.. Wunderlich may be served by serving its registered agent, Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904. Wunderlich may also be served by its attorney and authorized agent, Ronald S. Herzog, Steinberg & Cavaliere, LLP, 50 Main Street, White Plains, New York 10606.

## II. Jurisdiction and Venue

3. The amount in controversy well exceeds the minimum jurisdictional limits exclusive of interest and costs, giving this Honorable Court jurisdiction.

4. Venue in this Honorable Court is appropriate because the occurrences giving rise to Frontier's damages took place in Oklahoma City, Oklahoma. In addition, the contractual agreements from which all or a part of this lawsuit arises specifically provides exclusive venue in the State or Federal courts located in Oklahoma City, Oklahoma.

## III. FACTUAL BACKGROUND

5. Generally, this case involves a residential mortgage loan, sold by Vanguard Funding to Wunderlich, who then conveyed it to Frontier. Unbeknownst to Frontier, and in violation of the conveyance documents, the loan was significantly encumbered, and may have been sold multiple times to other entities prior to Frontier's purchase. After Frontier discovered this material breach, it notified Wunderlich, who failed to comply with its contractual obligations and return the consideration that had been paid by Frontier.

6. On September 7, 2016 (the "Origination Date"), Nicholas Protopapas (the "Borrower") obtained a $1,500,000.00 residential mortgage loan (the "Loan") from Vanguard Funding LLC (the "Originator"). The Loan is evidenced by that certain Consolidated Promissory Note (the "Genuine Note"), dated as of the Origination Date, between the Borrower and the Originator.[1]

7. Although the Genuine Note bears the Borrower's original "wet ink" signature, the Originator had the Borrower affix his original "wet ink" signature to a second promissory note (the "Fraudulent Note"), similarly dated as of the Origination Date, and similarly between the Borrower and the Originator.

8. On September 26, 2016, the Originator registered (the "MERS Registration") itself as the owner and servicer of the Loan on the Mortgage Electronic Registration System (the

[1] A true and correct copy of the Genuine Note is appended as Exhibit A hereto.

"MERS System"), a national electronic database that tracks changes in mortgage servicing rights and beneficial ownership interests in loans secured by residential real estate.[2]

9. Northpointe Bank ("Northpointe") has made a claim that on September 6, 2016, the Originator purportedly sold the Loan to Northpointe pursuant to a warehouse line of credit agreement between Northpointe and Originator. Northpointe claims that it has possession of the "wet ink" Genuine Note, and is the actual owner thereof and of the Loan.[3]

10. On March 17, 2017, Wunderlich contacted Frontier and made an offer (the "Sale Offer") to sell the Loan at a steep discount. Importantly, Wunderlich did not mention that the Loan may have already been sold to another entity six months earlier. Rather, the proposed letter of intent (the "Proposed LOI") attached to the Sale Offer (a) identified the Wunderlich as the "Seller" of the Loan, and (b) ensured that any purchase agreement would include a representation that "the Seller has clear, marketable, and transferable title for [the L]oan."

11. After negotiating the terms of the Proposed LOI, Frontier and Wunderlich executed a revised letter of intent (the "Final LOI") on March 20, 2017, and March 21, 2017, respectively.[4] Unlike the Proposed LOI, however, the Final LOI included — at the request and behest of the Defrauded Transferee — an express obligation that "the Seller shall repurchase any Loan that . . . fails to conform with any representation or warranty made by the Seller in the [purchase a]greement . . . ."

---

[2]According to the MERS, Inc. ("MERS"), "[t]he MERS[] System is not a legal system of record, nor a replacement for the public land records. No interests are transferred on the system; they are only tracked." *See* https://www.mersinc.org/join-mers/mers-system.

[3]Northpointe has also claimed that the Originator actually sold the same Note three separate times, receiving triple funding for the Loan by selling it to Northpointe for $1,500,000, to Santander (see below) for $1,503,037.02, and to Frontier for $1,299,803.62.

[4]A true and correct copy of the Executed LOI is appended as Exhibit B hereto.

12. In March of 2017, Wunderlich provided the Frontier with electronic copies (collectively, the "Diligence Package") of all credit documents and legal instruments relating to the Loan. Based upon a thorough review of the Diligence Package — which, not surprisingly, included electronic copies of the Genuine Note and the Fraudulent Note — Frontier decided to purchase the Loan on the terms and subject to the conditions set forth in a mutually agreeable Loan Purchase Agreement (the "Purchase Agreement") and Assignment, Assumption, And Recognition Agreement (the "Assignment Agreement").

13. On March 28, 2017, Wunderlich emailed closing instructions (the "Closing Instructions") to the Defrauded Transferee. In the Closing Instructions, Wunderlich expressly directed Frontier to remit payment of $1,299,803.62 (the "Purchase Price") by wire transfer to Wunderlich at the bank account specified by it in the Closing Instructions. That same day, the Frontier executed the Closing Instructions and emailed a copy thereof to Wunderlich for counter-execution.

14. On March 29, 2017 (the "Sale Date"), Frontier received for its final review physical copies (collectively, the "Collateral Package") of what was supposed to be genuine originals of all documents and instruments included in the Diligence Package. Although the Diligence Package included electronic copies of the Genuine Note and the Fraudulent Note, the Collateral Package did not include originals or copies of either instrument. Because the Purchase Agreement and industry practice permitted post-closing delivery of the missing instruments, and because Wunderlich agreed to obtain the missing instruments within a few days, Frontier decided to proceed with its purchase of the Loan without the Genuine Note or the Fraudulent Note in hand.

15. Upon Frontier's decision to proceed with the transaction, Wunderlich emailed the following documents to the Frontier:

(a) a fully-executed copy of the Closing Instructions;

(b) a fully-executed copy of the Purchase Agreement, dated as of the Sale Date, by and between (i) the Originator, as the seller of the Loan to Wunderlich, and (ii) Wunderlich, as the purchaser of the Loan from the Originator; and

(c) a partially-executed copy of the Assignment Agreement, dated as of the Sale Date, by and between (i) Wunderlich, as the assignor of the Loan and the Purchase Agreement to Frontier, (ii) Frontier, as the assignee of the Loan and the Purchase Agreement from Wunderlich, and (iii) the Originator, as the seller of the Loan to the Wunderlich.

16. Upon Wunderlich's receipt of the foregoing documents on the Sale Date, Frontier counter-executed the Assignment Agreement,[5] remitted payment of the Purchase Price to Wunderlich in accordance with the Closing Instructions, and acquired the Loan and all rights of Wunderlich under the Purchase Agreement subject to the terms and conditions set forth in the Purchase Agreement and the Assignment Agreement.

17. Specifically, and pursuant to Exhibit E of the Purchase Agreement, the Originator conveyed the Loan to Wunderlich subject to the following terms and conditions set forth in the Purchase Agreement:

(a) Subsection 6.09(a), which includes an express representation by the Originator that, on and as of the Sale Date, it (i) "[wa]s the sole and lawful owner and holder of indefeasible and marketable title — free and clear of all charges, claims, conditions, encumbrances, interests, liens, pledges, and other restrictions — to all rights

[5] A true and correct copy of the fully-executed Assignment Agreement is appended as Exhibit C hereto.

and interests in and to the [ ] Loan," and (ii) "ha[d] not assigned, conveyed, pledged, or transferred any rights or interests of the [Originator] in or to the [ ] Loan"; and

(b) Subsection 8.01(d), which includes an express obligation by the Originator that it "shall, on or before the date that is five (5) Business Days after receipt of Notice . . . , repurchase the [ ] Loan and remit . . . payment of the Repurchase Price" in the event that the Loan "fail[ed] . . . to conform with any representation, warranty, or covenant made by the [Originator]."

18. In turn, and pursuant to Section 1 of the Assignment Agreement, Frontier acquired the Loan and all rights of Wunderlich under the Purchase Agreement from Wunderlich in justifiable reliance upon (a) the foregoing representation made by the Originator in Subsection 6.09(a) of the Purchase Agreement, and (b) the following representation made by Wunderlich in Section 2(a) of the Assignment Agreement:

> "[Wunderlich] hereby represents, warrants, and covenants to [Frontier], on and as of the [Sale Date], that . . . the Assignor (i) is the sole and lawful owner and holder of indefeasible and marketable title — free and clear of all charges, claims, conditions, encumbrances, interests, liens, pledges, and other restrictions — to all rights and interests in [the] Loan, and (ii) has not assigned, conveyed, pledged, or transferred any rights or interests of the Assignor in or to the Purchase Agreement or [the] Loan . . . ."

19. On April 10, 2017, Frontier finally received a physical copy of the Fraudulent Note. To Frontier's surprise, however, affixed to the Fraudulent Note was a notice (the "Warehouse Notice") from Santander Bank (the "Warehouse Lender") advising that it purportedly held a security interest (the "Warehouse Lien") in the Loan, and instructing Frontier to remit payment of $1,470,000.00 by wire transfer to the Warehouse Lender at the bank account specified by it in the Warehouse Notice.[6]

---

[6] A true and correct copy of the Warehouse Notice is appended as Exhibit D hereto.

20. Because the existence of the Warehouse Lien constitutes a material breach of the representation made by the Originator in Subsection 6.09(a) of the Purchase Agreement, on May 19, 2017, Frontier delivered a written demand (the "Originator Demand") upon the Originator to repurchase the Loan. As of the date hereof, the Originator has disregarded the Originator Demand notwithstanding the Originator's undeniable and unequivocal breach of the representation made by it in Subsection 6.09(a) of the Purchase Agreement.

21. Because the existence of the Warehouse Lien also constitutes a breach of the representation made by Wunderlich in Section 2(a) of the Assignment Agreement, on May 31, 2017, Frontier delivered a written demand (the "Transferor Demand") upon Wunderlich to repurchase the Loan. As of the date hereof, Wunderlich has disregarded the Transferor Demand notwithstanding Wunderlich's undeniable and unequivocal breach of the representation made by it in Section 2(a) the Assignment Agreement.

22. Unfortunately for Frontier, the misrepresentations and omissions made by the Originator and Wunderlich were not limited to hiding the existence of the Warehouse Lien from an unwitting Frontier.

23. On May 2, 2017, the Originator changed the registration of the Loan on the MERS System to reflect Frontier as the owner and servicer of the Loan. Upon information and belief, this registration change alerted Northpointe (who claims to be the initial transferee) to a potential infringement by the Originator and/or Frontier upon the purported interest of Northpointe in the Loan. Consequently, on June 30, 2017, Northpointe called Frontier to advise that the Originator and Wunderlich were unable to sell the Loan because Northpointe was the purported owner of the Loan and possessor of the Genuine Note. Needless to say, the purported ownership by Northpointe of the Loan on the Sale Date constitutes a breach of the representation

made by the Wunderlich in Section 2(a) of the Assignment Agreement, as well as a breach of the representation made by the Originator in Subsection 6.09(a) of the Purchase Agreement.

24. As a final coup-de-grace, on July 13, 2017, Frontier received an email from MERS Corp. advising that it was obligated to update the MERS System to reflect Northpointe or its designee as the owner and servicer of the Loan notwithstanding Frontier's purchase thereof. As of the date hereof, the MERS System continues to reflect Northpointe as the owner and servicer of the Loan.

## IV. CLAIMS AND CAUSES OF ACTION

### A. Breach of Contract.

25. Plaintiff hereby restates and incorporated by reference every allegation contained in the foregoing paragraphs as if fully set forth herein.

26. As set forth in detail above, the Loan that Wunderlich sold to Frontier was materially inconsistent with the terms of the Assignment Agreement, its associated Purchase Agreement, and the LOI. The failure of the Loan to conform with the representations and warranties contained in the Assignment Agreement and Purchase Agreement was a material breach of the Assignment Agreement.

27. Wunderlich's failure to re-purchase the loan from Frontier pursuant to the explicit terms and requirements of the LOI was a material breach of the LOI, since the Loan failed to conform with representations and warranties made by the Seller in the Purchase Agreement, and the representations and warranties made by Wunderlich in the Assumption Agreement and LOI.

28. Frontier has made express demands on Wunderlich pursuant to the contractual provisions, that Wunderlich re-purchase the loan and remit payment of the amount of its payment to Wunderlich, $1,299,803.62. Wunderlich has failed and refused to do same.

29. As a direct and proximate result of Wunderlich's breaches of the Purchase Agreement, Assignment Agreement and the LOI, Frontier has suffered damages in at least the amount paid by Frontier, $1,299,803.62.

**B. <u>Specific Performance.</u>**

30. Plaintiff hereby restates and incorporated by reference every allegation contained in the foregoing paragraphs as if fully set forth herein.

31. The Executed LOI required Wunderlich to re-purchase any loans that failed to conform with representations and warranties made by the Seller in the Purchase Agreement. As set forth in detail above, the Loan here seriously failed to conform with the representations and warranties made by the Seller in the Purchase Agreement, and the representations and warranties made by Wunderlich in the Assumption Agreement.

32. Pursuant to the specific terms of the LOI, Frontier is entitled to specific performance of the re-purchase requirement, and Wunderlich should be compelled to re-purchase the Loan at the full contract price paid by Frontier, or $1,299,803.62.

**C. <u>Attorneys' Fees.</u>**

33. Plaintiff hereby restates and incorporated by reference every allegation contained in the foregoing paragraphs as if fully set forth herein.

34. The Purchase Agreement provides that Frontier may recover all of its costs, damages, fees (including without limitation attorneys' fees . . . arising out of, resulting from, or relating to "any breach by the Seller of any condition, covenant, representation, warranty, or other provision." Hence, in addition to applicable State laws allowing recover of attorneys' fees in such matters, Frontier has an express, contractual right to recover same from Wunderlich.

35. Frontier has made demand for Wunderlich to comply with its contractual obligations to re-purchase the Loan and to remit payment of the amount of its payment to Wunderlich, $1,299,803.62. Wunderlich has failed and refused to do same.

36. Frontier is entitled to recover its costs and attorneys' fees expended as a result of Wunderlich's failure to comply with its contractual obligations.

## IV. DAMAGES

37. Plaintiff hereby restates and incorporated by reference every allegation contained in the foregoing paragraphs as if fully set forth herein.

38. As a direct and proximate result of Wunderlich's breaches of contract, Frontier has suffered at least $1,299,803.62 in actual damages. Frontier also pleads for specific performance of the re-purchase requirement contained in the contractual agreement, along with:

a. attorney's fees;

b. pre-judgment interest as recoverable by law at the highest legally available rate;

c. post-judgment interest at the highest rate allowable by law; and

d. costs of Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Frontier State Bank, prays that Defendant, Wunderlich Loan Capital Corp., be cited to appear and answer and that, after trial by jury, judgment be entered against the Defendant for an amount not less than $1,299,803.62, all of Plaintiff's recoverable attorneys' fees and costs of court, pre- and post-judgment interest at the highest rates allowed by law, and for any further relief, at law or in equity, which this Honorable Court shall deem proper.

Dated the 19th day of September, 2017.

Respectfully Submitted,

STUART A. KNARR, OBA #13711
of the firm Pate, Kempf & Knarr, P.C.
P.O. Box 1907
Oklahoma City, OK 73101-1907
(405) 235-4211
(405) 232-3930 facsimile
sknarr@pkklawyers.com
Attorneys for Plaintiff

AND

**C. GREGORY SHAMOUN**
Texas State Bar No. 18089650
g@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Phone: (214) 987-1745
Fax: (214) 521-9033
Email: g@snlegal.com

**ATTORNEYS FOR PLAINTIFF**

**JURY TRIAL DEMANDED**
**PRE-JUDGMENTN INTEREST CLAIMED**

# Note Allonge

Loan#: 8001604066912

Date: 09/07/2016

Borrower: Nicholas Protopapas

Co-Borrower:

Loan Amount: $ 1,500,000.00

Property Address: 1-16 Samos Lane, Whitestone, NY, 11357

Pay to the order of:

Without recourse

Vanguard Funding LLC, a Limited Liability Company

By:______________________________

Matthew Voss, SVP.

Exhibit "A"

LOAN #: 8001604066912
MIN: 1004979-1108610203-1

# CONSOLIDATED NOTE

This Note amends and restates in their entirety, and is given in substitution for, the Notes described in Exhibit A of the New York Consolidation, Extension, and Modification Agreement dated the same date as this Note.

September 7, 2016 [Date] Garden City, [City] New York [State]

1-16 Samos Lane, Whitestone, NY 11357
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$1,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Vanguard Funding LLC, a Limited Liability Company.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.500 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **November 1, 2016.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **October 1, 2046,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **300 Garden City Plaza, Suite 170 Garden City, NY 11530**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$6,735.67.**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Initials: ______





LOAN #: 8001604066912

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________________________________ (Seal)
NICHOLAS PROTOPAPAS

**Lender: Vanguard Funding LLC**
**NMLS ID: 2675**
**Loan Originator: Brian Seth Ofsie**
**NMLS ID: 3377**

[Sign Original Only]
Initials: ________

# WUNDERLICH
Loan Capital Corp.

Whole Loan Trade Ticket

Date: 17-03-17
Target Settle Date: 29-03-17

Loan Servicing :

Seller:

Buyer:

| | |
|---|---|
| Product | Jumbo Scratch & Dent |
| Servicing | Released |
| $ UPB | $1,491,502 |
| Loan Count | 1 |
| Gross WAC | 3.500 |
| FICO: | 715 |
| | 1st Lien |
| LTV: | 62.5% |
| PRICE: | 87.0000 |

Price Adjustment on Rate: NA

Pool Parameters (Loan Schedule): See Exhibit A

SUBJECT TO:

1 Loans being sold Servicing Released, Settles with accrued interest.
2 All loans are 1st Lien Mortgages
3 The Seller shall repurchase any Loan that: (a) experiences (i) a monetary default with respect to the first, second, or third monthly payment after the Sale Date, or (ii) a bankruptcy, foreclosure, or litigation on or before the date that is 180 days after the Sale Date; or (b) fails to conform with any representation or warranty made by the Seller in the Agreement (as defined Paragraph 11 below).

4 The Servicing will transfer to the purchaser at a mutually agreed upon date.
5 The Seller or contracted Sub-Servicer will perform interim servicing for the Purchaser, at no charge, until transfer date.
6 The Seller will provide to the Purchaser copies of the complete Credit and Closing loan package for each loan within five business days following Trade Date. Additionally, the Seller will provide current 12 month paymen history or lifetime payment history, whichever is less.
7 Loans are materially as disclosed, including paid current at settlement. Property taxes should be current on the Closing date.
8 The loans will be approved for purchase at the sole discretion of the Purchaser.
9 This Letter of Intent is subject to the due diligence findings performed by the Purchaser.
10 In the event that the property value relating to any Loan is less than the property value indicated on Exhibit A, or should any other loan characteristic as to individual Loans, such as interest rate or delinquency status diffe materially from the characteristics provided in Exhibit A or otherwise indicated in advance of the preparation of this Letter of Intent, then Seller and Buyer shall negotiate, in good faith, a reduction in the purchase price of that individual Loan(s). In the event such price cannot be negotiated, Purchaser shall have the right to not purchase said Loan(s) and Seller shall have the right to not sell the Loan(s).
11 Prior to the sale of the loans, the Purchaser and Seller will enter into a definitive agreement for the purchase an sale of the loans in the form Mortgage Loan Purchase and Sale Agreement (the "Agreement"), which shall b prepared by counsel for the Purchaser and shall include conditions, covenants, representations, warrantie as may be mutually acceptable to Purchaser and Seller. Seller shall represent and warrant that each loan is a valid and enforceable first lien mortgage, and that the Seller has clear, marketable and transferable title for each loan.
12 Neither Purchaser nor Seller will be bound to purchase or sell the loans until such a definitive Agreement is signed by both parties
13 The full purchase price plus any accrued interest will be payable in one closing, whic will occur after the due diligence described above has been completed by Purchaser. The Settlement Date will be on or before the Target Settle Date or as otherwise determined by mutual consent between the Purchaser and Seller.
14 Upon execution of this Letter of Intent, Seller agrees to refrain from marketing the loans or providin information concerning the loans to any potential purchasers
15 Subject to re-pricing based on reasonable due diligence being conducted and current market valu

Neither Purchaser nor Seller will be bound to purchase or sell the loans until such a definitive Agreement is signed by both parties.

BUYER:

SELLER:

Exhibit "B"

out:blank



9/19/20

| Bid | Loan Number | Date of Tape ("As of") | FICO | Loan Program Type | Case Number/ Certificate Number | MI Coverage | MI Vendor | Purpose | Lien |
|---|---|---|---|---|---|---|---|---|---|
| 87 | 8001604066912 | 03-03-17 | 715 | JUMBO | N/A | N/A | N/A | ATE AND TERI | 1ST |

| Documentation Level | DTI | Note Rate | LTV | CLTV | Mtg P&I | Mtg T&I | Mtg MI |
|---|---|---|---|---|---|---|---|
| FULL | 32.035 | 3.5 | 62.5 | 62.5 | $ 6,735.67 | $ 1,794.57 | $ 8,530.24 |

| Origination Date | 1st Payment Due | Maturity | Next Payment Due | Original Term | Remg Term | Age |
|---|---|---|---|---|---|---|
| 07-09-16 | 01-11-16 | 01-10-46 | 01-03-17 | 360 | 356 | 4 |

| Original UPB | Current UPB | Original Appraisal | Sales Price If Purchase | 2nd Lien (Yes or No) | 2nd Lien Original Loan Amount | 2nd Lien Program Type |
|---|---|---|---|---|---|---|
| $ 1,500,000.00 | $ 1,491,502.30 | $ 2,400,000.00 | N/A | NO | N/A | N/A |

| Property Type | Occupancy | Property Street Address | Property City |
|---|---|---|---|
| SFD | PRIMARY | 116 SAMOS LANE | WHITESTONE |



| State | Property Zip | B/K Flag (T/F) |
| --- | --- | --- |
| NY | 11357 | F |

| Foreclosure Flag (T/F) | Default Flag (T/F) |
| --- | --- |
| F | F |

| Repayment Plan Flag (T/F) | Loan Modification Flag (T/F) | ARM Flag (T/F) | Date of B/K Filing (if any): |
| --- | --- | --- | --- |
| F | F | F | N/A |

| B/K Chapter: | Term of B/K Plan (in months): | Post-Petition Interest Paid-to Date (BK only): | Notice of Default Issue Date (If any): |
| --- | --- | --- | --- |
| N/A | N/A | N/A | N/A |

| Notice of Default Expiration Date: | Notice of Default Amount: | 1st Legal Date (If any) | FCL Trustee Sale Date (If any) |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Repayment Plan Date | Length of Repayment Plan | Payment Due Date | Payment Amount |
| --- | --- | --- | --- |
| N/A | N/A | N/A | N/A |

| # of Plan Payments Received | Index | Gross Margin (ARM only) | Initial Cap (ARM Only) |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Periodic Cap (ARM Only) | Lifetime Cap (ARM Only) | Minimum Interest Rate (ARM Only) | Maximum Interest Rate (ARM Only) |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Rate Change Frequency (ARM only) | First Rate Change Date | Next Rate Change Date | Neg Amortization (Y/N, ARM only) |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Defect Comments |
| --- |
| IRS payable of ~25K remaining balance from 2015 tax year |

# Signature Certificate



Document Reference: LRB66AJ3NI23Y4NPLJAAC8



Lukus Collins
Party ID: 3ZANM9JKHJ5LBBY7J2NRX2
IP Address: 24.249.228.10
VERIFIED EMAIL: lcollins@frontier-ok.com



Multi-Factor Digital Fingerprint Checksum: 8df428a8cb54d22fdf1b47902772f8871303e436



| Timestamp | Audit |
|---|---|
| 2017-03-20 07:54:42 -0700 | All parties have signed document. Signed copies sent to: Lukus Collins and Jason Goldsmith. |
| 2017-03-20 07:54:41 -0700 | Document signed by Lukus Collins (lcollins@frontier-ok.com) with drawn signature. - 24.249.228.10 |
| 2017-03-20 07:54:40 -0700 | Lukus Collins (lcollins@frontier-ok.com) has viewed Consumer Disclosure and affirmatively consented. - 24.249.228.10 |
| 2017-03-20 07:53:12 -0700 | Document viewed by Lukus Collins (lcollins@frontier-ok.com). - 24.249.228.10 |
| 2017-03-17 17:33:13 -0700 | Document created by Jason Goldsmith (jason@goldsmithassociates.com). - 107.200.227.154 |



This signature page provides a record of the online activity executing this contract.